**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WILLIAM M. DANIELS, JR., | ) | |
| | ) | Civil Action No. 06 - 741 |
| Petitioner, | ) | |
| | ) | |
| v. | ) | District Judge David S. Cercone |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| HENRY WILSON, Superintendent, and THE | ) | |
| DISTRICT ATTORNEY OF ALLEGHENY | ) | |
| COUNTY and THE ATTORNEY GENERAL | ) | |
| OF THE COMMONWEALTH OF | ) | |
| PENNSYLVANIA, | ) | |
| | ) | |
| Respondents. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is respectfully recommended that the Petition for Writ of Habeas Corpus be denied and that a certificate of appealability be denied.

### II. REPORT

Petitioner, William M. Daniels, Jr., a state prisoner incarcerated at the State Correctional Institution at Dallas, Pennsylvania, has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons that follow, the Petition should be denied as without merit.

#### A. Relevant Factual and Procedural History

Petitioner was charged with one count of Criminal Homicide, one count of Violation of the Uniform Firearms Act (VUFA) and one count of Criminal Conspiracy as a result of the September 20, 1994 shooting of Ronald Hawkins, a jitney driver who was shot to death while driving in the Mexican War Streets area of Pittsburgh, Pennsylvania. On September 24, 1998, Petitioner was

convicted by a jury of Murder in the First Degree and the remaining charges in the Court of Common Pleas of Allegheny County. On November 23, 1998, the court sentenced Petitioner to a term of life imprisonment for the homicide conviction plus consecutive terms of 3½ to 7, and 10 to 20 years' imprisonment on the remaining convictions. Petitioner filed a timely Notice of Appeal to the Superior Court of Pennsylvania and on November 1, 1999, the trial court issued its Opinion denying Petitioner's points on appeal (Commonwealth Exhibit 12, ECF No. 20-3). On November 27, 2000, the Superior Court of Pennsylvania affirmed Petitioner's judgment of sentence (Commonwealth Exhibit 19, ECF No.20-6). His Petition for Allowance of Appeal with the Pennsylvania Supreme Court was denied on June 22, 2001 (Commonwealth Exhibit 22, ECF No. 20-8).

On July 23, 2002, Petitioner filed a *pro se* petition pursuant to the Post-Conviction Relief Act (PCRA). New counsel filed an Amended PCRA Petition on October 3, 2003. On June 3, 2004, Judge Bigley issued a Notice of Intention to Dismiss Amended PCRA Petition (Commonwealth Exhibit 27, ECF No. 21-4) and on July 13, 2004, he dismissed the petition. Petitioner filed a Notice of Appeal and on July 6, 2005, the Superior Court affirmed the trial court's order denying Petitioner's PCRA petition (Commonwealth Exhibit 34, ECF No. 21-7). On October 19, 2005, Petitioner filed a Petition for Allowance of Appeal wherein he argued, *inter alia*, that the Superior Court erred in ruling on the merits of the claim of Eric Ross' recantation instead of remanding that claim for an evidentiary hearing. On March 8, 2006, the Supreme Court granted the petition solely with respect to Petitioner's claim that the Superior Court erred in considering the recantation testimony of Eric Ross (Commonwealth Exhibit 38, ECF No. 21-10). As a result, the Supreme Court vacated the Order of the Superior Court in part and remanded the case.

On May 19, 2006, Petitioner filed a Supplemental Petition Pursuant to the PCRA. On July 15, 2008, an evidentiary hearing was held. On July 15, 2008, Judge Bigley dismissed the petition.

Petitioner filed a Notice of Appeal and on October 17, 2008, Judge Bigley filed his Opinion denying PCRA relief (Commonwealth Exhibit 49, ECF No. 22-5). On May 5, 2009, the Superior Court affirmed the judgment of the trial court denying PCRA relief (Commonwealth Exhibit 53, ECF No. 22-7). Petitioner filed a Petition for Allowance of Appeal, which was denied by the Supreme Court of Pennsylvania on September 30, 2009.

On June 7, 2006, Petitioner filed his Petition for Writ of Habeas Corpus in this action. On November 1, 2006, the case was stayed to enable Petitioner to present his unexhausted claim to the Pennsylvania state courts. On November 2, 2009, the Commonwealth filed a Notice of Completion of State Appeal and on November 6, 2009, District Judge Cercone reopened Petitioner's case. Petitioner raises the following claims in his Petition.

1. The petitioner's right to due process under the United States Constitution was violated given the evidence of the record, the trial court abused its discretion in finding the verdict was "not" against the weight of the evidence.

2. The petitioner's right to due process under the United States Constitution was violated because the evidence was insufficient to support the conviction of first degree homicide and the evidence did not support the finding that petitioner participated in the shooting.

3. The petitioner's right to due process under the United States Constitution was violated because the trial court abused its discretion by admitting Eric Ross testimony that petitioner shot him (3) days before homicide over objections of counsel. The Commonwealth offered this testimony to prove possession of the .40 cal saw firearm and identification of petitioner.

4. The petitioner's right to due process under the United States Constitution was violated when the trial court erred in not granting a new trial for jury misconduct and the PA. Superior Court and PA. Supreme Court erred in holding that a claim of juror misconduct is not cognizable under the PCRA.

5. The petitioner's right to due process under the United States Constitution was violated by juror misconduct, police

misconduct/prosecutorial misconduct, and recantation evidence, and the newly discovered evidence of "exculpatory" eyewitness Jermale Walker.

    A.      Juror Misconduct

    B.      Police Misconduct—Prosecution Misconduct

    C.      The newly discovered evidence of "exculpatory" eyewitness testimony of Jermale Walker.

    D.      Recantation Evidence

6.     Petitioner's right to due process under the United States Constitution was violated and petitioner is entitled to a new trial based upon the after-discovered materially exculpatory evidence of Rayco Saunders' identification of another person who was in possession of the murder weapon at the time of the commission of, and committed, the homicide in the instant matter.

7.     Petitioners' 6th Amendment rights under the United States Constitution were violated by ineffective assistance of counsel.

    A.      Trial counsel was ineffective for failing to file a written motion or perfect his argument with regard to the suppression of the petitioner's "statement." The legal basis for the petitioner's suppression motion is "not clear" for the record. The petitioner asserts that he "never" gave the statement or signed the rights form.

    B.      Trial counsel was ineffective for failing to interview, investigate and present two fact witnesses Norman Daniels and Robert Bledsoe; and for failing to investigate and interview and present (2) alibi defense witnesses Norman Daniels and Tolania Williams. All (4) witnesses were known to trial counsel and were willing to testify at trial.

8.     The petitioner's right to due process under the United States Constitution was violated when the trial court erred when it granted the Commonwealth's motion to prevent counsel for defense to cross-examine Commonwealth star witness Tina Banks about her involvement in narcotics and the bias Ms. Banks had against petitioner for assaulting her brother.

9.   Claims based on "actual innocence" or misconduct of justice cannot be procedurally barred because the imprisonment on an innocent person violates the due process clause and the 8th Amendment prohibition against cruel and unusual punishment.

## B. Standards Governing Federal Habeas Corpus Review

1.   <u>Exhaustion Requirement</u>

The provisions of the federal habeas corpus statute at 28 U.S.C. § 2254(b) require a state prisoner to exhaust available state court remedies before seeking federal habeas corpus relief.  To comply with the exhaustion requirement, a state prisoner first must have fairly presented his constitutional and federal law issues to the state courts through direct appeal, collateral review, state *habeas* proceedings, *mandamus* proceedings, or other available procedures for judicial review.  *See, e.g.*, <u>Castille v. Peoples</u>, 489 U.S. 346, 351 (1989); <u>Doctor v. Walters</u>, 96 F.3d 675, 678 (3d Cir. 1996); <u>Burkett v. Love</u>, 89 F.3d 135, 137 (3d Cir. 1996).  Moreover, a petitioner must present every claim raised in the federal petition to the state's trial court, intermediate appellate court and highest court before exhaustion will be considered satisfied.  <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838 (1999).  The petitioner has the burden of establishing that exhaustion has been satisfied.  <u>Ross v. Petsock</u>, 868 F.2d 639, 643 (3d Cir. 1989); <u>O'Halloran v. Ryan</u>, 835 F.2d 506, 508 (3d Cir. 1987).

Exhaustion is not a jurisdictional limitation, however, and federal courts may review the merits of a state petitioner's claims prior to exhaustion when no appropriate state remedy exists.  <u>Christy v. Horn</u>, 115 F.3d 201, 206 (3d Cir. 1997); <u>Doctor</u>, 96 F.3d at 681; <u>Carter v. Vaughn</u>, 62 F.3d 591, 594 (3d Cir. 1995).  Moreover, an application for a writ of habeas corpus may be denied on the merits, however, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.  28 U.S.C. § 2254(b)(2).

In the instant action, Petitioner has presented his claims to the Pennsylvania state courts. Thus, his claims are exhausted for my purposes of review.

2.    Standard of Review

In describing the role of federal habeas proceedings, the Supreme Court of the United States, in Barefoot v. Estelle, 463 U.S. 880, 887 (1983), noted:

> [I]t must be remembered that direct appeal is the primary avenue for review of a conviction or sentence.... The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials.

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214, April 24, 1996, (AEDPA), which further "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

Amended Section 2254 of the federal habeas corpus statute provides the standard of review for federal court review of state court criminal determinations and provides, in relevant part, as follows:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C.§ 2254(d).

"A state-court decision is 'contrary to' clearly established federal law if the state court (1) 'contradicts the governing law set forth in [the Supreme] Court's cases' or (2) 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result.'" Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir.2004) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Few state court decisions will be "contrary to" Supreme Court precedent. "Clearly established Federal law" should be determined as of the date of the relevant state-court decision. Greene v. Palakovich, Civil No. 07-2163, 2010 WL 2134575 (3d Cir. May 28, 2010).

The federal habeas court more often must determine whether the state court adjudication was an "unreasonable application" of Supreme Court precedent. "A state-court decision 'involve[s] an unreasonable application' of clearly established federal law if the state court (1) 'identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular … case'; or (2) 'unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" Id. (quoting Williams, 529 U.S. at 407).

A recent decision of the Supreme Court illustrates the deference that the federal courts must accord to state court decisions. In Renico v. Lett, ___ U.S. ___, 130 S.Ct. 1855 (May 3, 2010), the Supreme Court reviewed the Court of Appeals for the Sixth Circuit's grant of a writ of habeas corpus to a defendant who was retried for murder following the trial judge's grant of a mistrial after the jury had deliberated for at least four hours following a relatively short, and far from complex, trial. The Michigan Supreme Court had concluded there was no violation of the Double Jeopardy Clause because the trial court exercised its sound discretion. The federal district court granted a writ of

habeas corpus and the Sixth Circuit affirmed, both concluding that the trial court's declaration of a mistrial constituted an abuse of discretion because there was no manifest necessity. The Supreme Court reversed.

> It is important at the outset to define the question before us. That question is not whether the trial judge should have declared a mistrial. It is not even whether it was an abuse of discretion for her to have done so-the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of ... clearly established Federal law." § 2254(d)(1).

<u>Lett</u>, 130 S.Ct. at 1862. The Supreme Court further instructed:

> It is not necessary for us to decide whether the Michigan Supreme Court's decision - or, for that matter, the trial judge's declaration of a mistrial - was right or wrong. The latter question, in particular, is a close one. As Lett points out, at a hearing before the Michigan Court of Appeals, the state prosecutor expressed the view that the judge had in fact erred in dismissing the jury and declaring a mistrial. The Michigan Supreme Court declined to accept this confession of error, People v. Lett, 463 Mich. 939, 620 N.W.2d 855 (2000), and in any event - for the reasons we have explained - **whether the trial judge was right or wrong is not the pertinent question under AEDPA.**

*Id*. at 1865, n. 3 (emphasis added).

Moreover, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. 28 U.S.C. § 2254(e). Where a state court's factual findings are not made explicit, a federal court's "duty is to begin with the [state] court's legal conclusion and reason backward to the factual premises that, as a matter of reason and logic, must have undergirded it." <u>Campbell v. Vaughn</u>, 209 F.3d 280, 289 (3d Cir. 2000). In determining what implicit factual findings a state court made in reaching a conclusion, a federal court must infer that the state court applied federal law correctly. *Id*. (citing <u>Marshall v. Lonberger</u>,

459 U.S. 422, 433 (1982)). Where the state court fails to adjudicate or address the merits of a petitioner's claims, unless procedurally defaulted, the federal habeas court must conduct a *de novo* review over pure legal questions and mixed questions of law and fact. Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001). Petitioner's claims will be reviewed in accordance with the standards set forth above.

### C. Petitioner's Claims

1. The petitioner's right to due process under the United States Constitution was violated given the evidence of the record, the trial court abused its discretion in finding the verdict was "not" against the weight of the evidence.

In his first claim, Petitioner asserts that the trial court abused its discretion in finding that the verdict was not against the weight of the evidence. Petitioner raised this claim on direct review where the trial court made the following observations.

> The evidence presented at trial established that on the evening of September 20, 1994, the victim in this case, Ronald Hawkins, was shot to death while driving on Alpine Street in the Mexican War Streets area of the City of Pittsburgh. Hawkins, a jitney driver, was shot six times in the abdomen and bled to death at the scene.

> The Commonwealth's first witness was John Savelli, a police officer with the City of Pittsburgh Police. On September 20, 1994, he responded to a call of shots fired on Alpine Street. Upon arrival he saw a large crowd of people around a vehicle in the street. The victim in the car appeared to be shot and was struggling to breathe. After calling for paramedics, he and his partner secured the area. He noticed many casings on the ground a short distance up the street. The shell casings were .40 caliber and 9mm.

> The Commonwealth's second witness was Jeff Trunk, a paramedic with the City of Pittsburgh. He was dispatched to the scene and found the victim behind the wheel of his car with multiple gunshot wounds to the abdomen. The victim had no pulse and was close to death. The victim could not be revived and was pronounced dead on arrival at the hospital.

. . .

The Commonwealth's fourth witness was Phares Hutton, who was employed as a Homicide Detective with the City of Pittsburgh until he retired in January 1995. He and his partner, Detective Jack Byer, were called to the scene and found the victim's car in the middle of the intersection of Apline and Monterey Streets. This witness described bullet holes in the victim's car and .40 caliber and 9mm casings which were found in various areas, on both sides of Alpine Street, within an area of 100 to 200 feet from the victim's car. Bullet holes were also found in a parked vehicle and a house. Eighteen casings were found and collected in all. Damage to a fence and the victim's car, as well as fluid which leaked from the vehicle indicated that the car had gone up Alpine Street and then backed down the street hitting a fence and a small tree before coming to rest at the bottom of the street at the intersection with Monterey. This witness and his partner were unable to locate any witnesses to the shooting that evening. Both he and his partner retired before any arrest was made in this case.

The Commonwealth's fifth witness was Dale Canofari, a detective with the City of Pittsburgh Police Homicide Division. This witness took a number of photographs of the scene which were admitted as evidence. He also interviewed a witness named Tina Banks.

The Commonwealth's sixth witness was Charles Pharr. On September 20, 1994, he was in his home on Monterey Street when he heard ten or fifteen gunshots. He went outside and saw the victim's car drifting backward down Alpine Street toward. Monterey. This witness reached inside the car and turned the engine off and put the car in park.

The Commonwealth's seventh witness was Tina Banks. She testified that she was playing cards in front of her house on Alpine Street with four other people. There were other people in the area hanging out and drinking. Banks was acquainted with the defendant, and testified that he was directly across the street, in front of the home of his brother. The defendant was with two or three other men, all were standing in front of the defendant's Dodge Caravan. Someone rode by on a bicycle and said "an O.G. [gangmember] is coming up in a gray car." The witness then saw the defendant and the other men reach into his van and retrieve guns. The defendant and the other men ran down Alpine Street toward Monterey Street. The defendant, brandishing a gun, shot at the front of a gray car which was coming

up Alpine Street. All of the men fired at the car while the victim shouted that he was a jitney driver. The defendant then ran to the passenger side of the vehicle and kept shooting. The victim's car drifted backward down Alpine Street and, after hitting a fence and a stop sign, came to rest at the intersection of Alpine and Monterey Streets.

After the shooting, Banks saw the defendant run behind 253 Alpine Street still holding his gun. He later came back up the street and walked past her. Although she saw the police arrive that night, she was never asked if she had seen anything until detectives came to her home in August 1995. At that time,. she told detectives what she had seen.

On cross-examination this witness stated that she did not remember and could not identify the four people she was playing cards with that night. She acknowleged that she had testified at the coroner's inquest that the men she was playing cards with were Robert Bledsoe, Norm Daniels and a man named Nick.

The Commonwealth's eighth witness was Thomas Carr, a gang member from Detroit. He testified that he and two men named Edward "Flex" Dale and John "Duck" Thornton were with the defendant on Alpine Street that night, smoking pot and drinking. This witness knew the defendant to be a gang member and carry handguns, a Ruger and a Glock 9mm. Flex had the defendant's Ruger, and Duck had the 9mm. The defendant had a sawed-off shotgun. After someone stated that an O.G. was coming, the defendant and the two other men ran toward the car and began firing. The defendant also fired from the driver's side of the car while Flex was on the passenger side. After the shooting all of the men ran behind the defendant's brother's house to hide the guns before leaving the area. As they were leaving the defendant gave Duck and Flex the high five and said, "we got him." After "Duck" and "Flex" said it was a jitney driver the defendant replied, "I don't care." The defendant also told Thomas Carr that he had shot a man on Perrysville Avenue an few days before this incident. After the Alpine shooting this witness returned to Detroit and turned himself in on charges that were pending against him before he came to Pittsburgh. He was eventually convicted on two counts of Murder, as well as weapons charges. He agreed to tell authorities what he knew about gang activity and testify when needed. He had no agreement with the Office of the District Attorney of Allegheny County regarding testimony in this case.

On cross-examination this witness testified that his sentence had already been reduced from life to 25 years, but he hoped to get a further reduction through his continued cooperation. He also acknowledged that he may have initially told investigators that a girl rode by on a bike and stated that O.G.'s were coming.

The Commonwealth's ninth witness was Scott Dyer, a Deputy United States Marshal based in Ann Arbor, Michigan. On October 13, 1995, this witness arrested the defendant in Milan, Michigan after being made aware of a warrant for his arrest. When he arrived at a residence in Milan and told the defendant he was under arrest, the defendant stated that he was "tired of running" and wanted to know "who snitched on him."

. . .

The Commonwealth's eleventh witness was Richard McDonald, a detective with the City of Pittsburgh Homicide Division. This witness went to Milan, Michigan after the defendant was arrested by the United States Marshal's Office. He mirandized the defendant and took him to the airport for transport back to Pittsburgh. Upon arrival in Pittsburgh, the defendant was taken to the Homicide Division in East Liberty. There the defendant was again informed of his Miranda rights before signing a Miranda Waiver and giving a statement to police. The defendant stated that he was at his brother's home on Alpine Street on the night of the shooting. He claimed that a passenger in the victim's car was shooting and that one of his relatives had been shot. When asked if he had fired any shots, the defendant stated that he didn't have to shoot anyone. He said that he was a gang leader and had people who could shoot someone for him. To back up his claim of being a gang leader, he showed the detectives numerous tattoos on his body of gang symbols. The interview concluded when the defendant responded that he did not want to answer any more questions.

The Commonwealth's twelfth witness was Eric Ross. This witness testified that on September 17, 1994, three days before the victim was killed, he was sitting with some friend on Perrysville Avenue on the North Side when a Dodge Caravan came around the corner with the side door open. Many gunshots were fired at them from the van. One man was shooting from the passenger side and another man was shooting through the open door. This witness knew the defendant from the neighborhood and identified him as the person shooting from the passenger side of the Caravan. He testified that a bullet struck him in the buttocks and that he was taken to the hospital for treatment.

. . .

The Commonwealth's fifteenth witness was Dr. Robert Levine, a criminologist with the Allegheny Crime Lab. He examined evidence submitted in this case. Specifically, he examined three discharged .40 caliber shell casings retrieved from the scene. He determined that all three were fired from the same weapon, a .40 caliber semi automatic. He also examined fourteen 9mm casings. He determined that all of those casings were fired from the same weapon, a 9mm Ruger semi-automatic. He also examined two 9mm copper jacketed bullets from the scene, as well as three 9mm jacketed bullets submitted from the Coroner's office. He determined that all five were discharged from the same weapon, a 9mm semi-automatic Ruger. From all the evidence he examined, he was able to determine that at least three firearms were fired during this incident, one .40 caliber and at least two 9mm weapons. He did not examine any evidence that would indicate that a sawed-off shotgun was used, nor could he say that one had not been used.

This witness also examined evidence relative to the shooting of Eric Ross on September 17, 1994. From that scene, he examined one .40 caliber shell casing and compared it with the evidence collected in this case. He determined that the same .40 caliber weapon and 9mm weapon fired in this case were also used in the shooting of Eric Ross.

Tr. Ct. Op. dated Oct. 26, 1999, pp. 4-11 (Commonwealth Ex. 12, ECF No. 20-3).

Petitioner asserts that the trial court abused its discretion in finding that the verdict was not

against the weight of the evidence. Petitioner raised this claim on direct appeal where the Superior

Court held as follows.

In the present case, Appellant essentially challenges the eyewitnesses' credibility, pointing out that Ms. Banks admitted that it was dark at the time of the shooting, and Mr. Carr admittedly had an interest in testifying to gain leniency with his murder charges. The factfinder, in this case the jury, is the sole judge of credibility. The jury was informed about the purported bias and poor viewing conditions and chose to believe these witnesses. We are not permitted to overturn that credibility determination.

Appellant also points to some inconsistencies between Ms. Banks's trial testimony and her August 1995 statement to police as

well as inconsistencies between her testimony and that of Mr. Carr. The jury was informed about all inconsistencies between Ms. Banks's initial statement to the police and her trial testimony as well was inconsistencies between the testimony of Mr. Carr and Ms. Banks. By the 1998 trial, Ms. Banks indicated that she could not identify the two other shooters even though she had identified them in her August 1995 statement. In addition, there were discrepancies between Ms. Banks and Mr. Carr about who shot from where and whether the person who shouted that a member of the OGs was coming was a male or female, was running, or was on a bicycle. Nonetheless, both eyewitnesses clearly stated that Appellant was involved.

Furthermore, it is clearly established that an inconsistency in a Commonwealth witness's testimony does not establish a witness's unreliability; rather, inconsistencies create a credibility issue for the jury to resolve. The inconsistencies in the Commonwealth's evidence were resolved by the jury through its credibility determination, which cannot be assailed on appeal. Hence, we agree with the trial court that Appellant's challenge to the weight of the evidence must fail.

Sup. Ct. Op. dated Nov. 27, 2000, pp. 10-11 (Commonwealth Ex. 19, ECF No. 20-6) (emphasis in original) (citations omitted).

My review of this claim under the federal habeas statute is limited. Any state-court factual finding that is fairly supported by the record is entitled to a presumption of correctness. The Supreme Court specifically has instructed that a federal habeas court has no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them. Marshall v. Lonberger, 459 U.S. 422 (1983). Petitioner has failed to overcome the presumption of correctness as to the state court's factual findings. Consequently, Petitioner is not entitled to habeas corpus relief as to this claim.

2.      The petitioner's right to due process under the United States Constitution was violated because the evidence was insufficient to support the conviction of first degree homicide and the evidence did not support the finding that petitioner participated in the shooting.

In his second claim, Petitioner asserts that the evidence was insufficient to support his convictions.  Where a petitioner challenges his incarceration on the ground that the evidence was insufficient to support his conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979). Under this standard, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume--even if it does not affirmatively appear in the record--that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Jackson, 443 U.S. at 326.  *Accord* Moore v. Deputy Commissioner(s) of SCI-Huntington, 946 F.2d 236, 243 (3d Cir. 1991), *cert. denied*, 503 U.S. 949 (1992).  A federal court must apply this standard " 'with explicit reference to the substantive elements of the criminal offense as defined by state law.' " Orban v. Vaughn, 123 F.3d 727, 731 (3d Cir. 1977)  (quoting Jackson, 443 U.S. at 324 n. 16), *cert. denied*, 522 U.S. 1059 (1988). [1] *See also* Jackson v. Byrd, 105 F.3d 145, 149 (3d Cir.) (federal habeas courts look to the evidence the state considers adequate to meet the elements of a crime governed by state law), *cert. denied*, 520 U.S. 1268 (1997).  The jury,

---

1.  The individual states define the elements of state offenses.  Patterson v. New York, 432 U.S. 197, 201 (1977) ("It goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government . . . and that we should not lightly construe the Constitution so as to intrude upon the administration of justice by the individual States").  *Cf.* Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997) ("[i]t is axiomatic that Pennsylvania may, within certain constitutional limits, define first-degree murder in whatever way the Commonwealth sees fit").  A federal court is bound by a state court's construction of a state statute.  Wisconsin v. Mitchell, 508 U.S. 476 (1993).  *See also* Schad v. Arizona, 501 U.S. 624, 636 (1991) (federal courts are not free to substitute their own interpretations of state statutes for those of a State's courts); Mulanney v. Wilber, 421 U.S. 684 (1975) (exceptional circumstances being absent, United States Supreme Court accepted, as binding, the Maine Supreme Judicial Court's construction of its state homicide law).

however, weighs the evidence and the federal courts must defer to the jury's resolution of conflicts in the evidence. Jackson, 443 U.S. at 326. Moreover, when a state appellate court thoroughly reviews the sufficiency of evidence, that court's determination is entitled to great weight. Parke v. Raley, 506 U.S. 20, 36 (1993). This deferential test places a very heavy burden on the appellant. United States v. Coyle, 63 F.3d 1239, 1243 (3d Cir. 1995).

The test for insufficiency of evidence is the same under both Pennsylvania and federal law. *See* Evans v. Court of Common Pleas, Delaware County, 959 F.2d 1227, 1233 (3d Cir. 1992), *cert. denied*, 506 U.S. 1089 (1993); Commonwealth v. Bricker, 525 Pa. 362, 581 A.2d 147 (1990) (an appellate court must determine whether the evidence, and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offenses charged).

Petitioner was convicted of murder in the first degree under 18 Pa. Cons. Stat. § 2502(a). In order to sustain Petitioner's first-degree murder conviction, the evidence must show, beyond a reasonable doubt, the following three elements: 1) the victim was unlawfully killed; 2) the defendant is responsible for the killing; and (3) the defendant acted with a specific intent to kill, *i.e.*, in a willful, deliberate, premeditated way. Commonwealth v. Flor, 998 A.2d 606, 615 (Pa. 2010). There is no requirement in Pennsylvania law that a homicide, including one of murder in first degree, be proven by positive eyewitness testimony; circumstantial evidence may be sufficient to prove any element, or all of elements of a crime. Commonwealth v. Chambers, 599 A.2d 630, 528 Pa. 558 (1991), *cert. denied*, 504 U.S. 946 (1992); Commonwealth v. Crowson, 412 A.2d 1363, 488 Pa. 537 (1979). Specific intent to kill can be inferred from the use of a deadly weapon upon a vital part of the body. Commonwealth v. Freeman, 827 A.2d 385, 404, 573 Pa. 532, 563 (2003), *cert. denied*, 543 U.S. 822 (2004).

Petitioner also was convicted of conspiracy to murder. To prove conspiracy, "the trier of fact must find that: 1) the defendant intended to commit or aid in the commission of the criminal act; 2) the defendant entered into an agreement with another to engage in the crime; and 3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime." Commonwealth v. Montalvo, 598 Pa. 263, 956 A.2d 926, 932 (2008), *cert. denied*, 129 S.Ct. 1989 (2009) . In most cases of conspiracy, it is difficult to prove an explicit or formal agreement; hence, the agreement is generally established via circumstantial evidence, such as by "the relations, conduct, or circumstances of the parties or overt acts on the part of co-conspirators." Commonwealth v. Spotz, 552 Pa. 499, 716 A.2d 580, 592 (1998). In the case of a conspiracy to commit homicide, each member of the conspiracy "can be convicted of first-degree murder regardless of who inflicted the fatal wound." Montalvo, 956 A.2d at 932.

On direct appeal, the trial court held has follows with respect to Petitioner's sufficiency of the evidence claim.

> Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, it is clear that the jury had ample evidence from which they could find that the defendant was guilty of First Degree Murder. Witnesses Tina Banks and Thomas Carr place the defendant at the scene on Alpine Street shooting at the victim. After someone stated that the O.G.'s were coming, the defendant, Carr, Dale and Thornton ran up on the victim's car and began firing. Tina Banks stated that all of the men were firing. Thomas Carr claims that he did not fire into the car, that he shouted to the other three men that it was just a jitney driver. The defendant was also identified by Eric Ross as the man who shot him three (3) days earlier on Perrysville Avenue. Dr. Robert Levine testified that the same .40 caliber and 9mm weapons used in the Eric Ross shootings were used in the shooting of the victim. The defendant then fled the area and was later arrested in Michigan. After being returned to Pittsburgh and making bond, fled again to Georgia. The jury had more than enough evidence to find that the defendant and the other men conspired to ambush the victim in this case and shot him to death. As such, the

evidence was sufficient to sustain a finding of guilt of First Degree Murder, Criminal Conspiracy and firearms charge.

(Commonwealth Ex. 12 at 12-13, ECF No. 20-3).

The Superior Court of Pennsylvania affirmed this holding and concluded as follows.

On appeal, Appellant asserts that the evidence was insufficient to support his conviction for first degree murder. Specifically, he contends that his conviction is infirm based on the fact that the Commonwealth failed to establish that 1) that he was the shooter; 2) that he had malice aforethought; and 3) that he had the specific intent to kill. We disagree.

The test for determining the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the Commonwealth as the verdict winner and drawing all proper inferences favorable to the Commonwealth, the jury could have determined that all of the elements of the crime have been established beyond a reasonable doubt.

To sustain a conviction for first degree murder, the Commonwealth must establish beyond a reasonable doubt that a person was killed, the accused did the killing, the killing was done with malice; and the killing was done with premeditated intent to kill.

In this case, Appellant was convicted of conspiracy as well as first degree murder. The essence of a conspiracy is an agreement or common understanding to commit a crime. 18 Pa.C.S. §903(a)(2). The Commonwealth seldom can establish an explicit agreement, and in recognition of this fact, the agreement can be proven by evidence showing that the relation, conduct, circumstances, and overt acts by the conspirators indicate the formation of a criminal confederation.

Thus, certain circumstances may raise the inference of a conspiracy and prove beyond a reasonable doubt that the defendant engaged in the criminal activity. Those circumstances include an association among the participants, knowledge of the crime, presence at the crime scene, and participation in the object of the conspiracy. Herein, all circumstances are present. The three gunman were informed that a member of a rival street gang was about to appear. They grabbed firearms in concert and started to fire at the car in unison as soon as it arrived. The object of the conspiracy was to kill the street gang member, and Appellant participated in that objective by firing his gun at the victim. Since each conspirator is liable for the

actions of his co-conspirators in furtherance of the conspiracy, it is irrelevant that Appellant was or was not the shooter. One of the three co-conspirators fired the deadly shot, and Appellant is liable for that action. Furthermore, malice and specific intent to kill are established by the fact that a deadly weapon was fired upon a vital body part of the victim. The evidence was sufficient to support the verdict.

(Commonwealth Ex. 19 at 8-9, ECF No. 20-6).

Petitioner has failed to demonstrate that the decisions of the Pennsylvania courts were clearly contrary to federal law or an unreasonable application of federal law. Nor has he shown that the decisions were based on an unreasonable determination of the facts in light of the evidence presented. Consequently, Petitioner is not entitled to habeas corpus relief as to this claim.

3.     The petitioner's right to due process under the United States Constitution was violated because the trial court abused its discretion by admitting Eric Ross' testimony that petitioner shot him (3) days before homicide over objections of counsel. The Commonwealth offered this testimony to prove possession of the .40 cal saw firearm and identification of petitioner.

Petitioner's third claim is that the Trial Court erred in permitting the Commonwealth to introduce evidence of prior bad acts. Such evidence generally is not admissible if offered merely to show bad character or a propensity for committing bad acts. Commonwealth v. Simmons, 541 Pa. 211, 240, 662 A.2d 621, 635 (1995), *cert. denied*, 576 U.S. 1128 (1996). Exceptions to this general proscription exist in special circumstances where the evidence is relevant for some other legitimate purpose and not merely designed generally to prejudice the defendant by showing him to be a person of bad character.

Such evidence is admissible when it tends to prove a common scheme, plan or design, malice, absence of mistake or accident, motive, or intent for the offense charged. Furthermore, our courts will allow evidence of other crimes when it tends to establish the identity of the person charged with the commission of the crime or where it was part of the chain or sequence of events which form the

history of the case and formed part of the natural development of facts.

Simmons, 541 Pa. at 241, 662 A.2d at 636.

Recognizing that evidence of prior criminal acts has the potential for misunderstanding on the part of the jury, Pennsylvania law holds that such evidence must be accompanied by a cautionary instruction that fully and carefully explains to the jury the limited purpose for which that evidence has been admitted. Commonwealth v. Richter, 711 A.2d 464 (Pa. 1998); Commonwealth v. Elliott, 549 Pa. 132, 700 A.2d 1243 (1997), *cert. denied*, 524 U.S. 955 (1998). Notwithstanding, the failure to request or give such cautionary instructions does not automatically require reversal of a conviction. Rather, a court must engage in a "harmless error" analysis. Commonwealth v. Foy, 531 Pa. 322, 326-28, 612 A.2d 1349, 1352 (1992); Commonwealth v. Sanchez, 407 Pa. Super. 234, 240-42, 595 A.2d 617, 621 (1991), *appeal denied*, 529 Pa. 668, 605 A.2d 333 (1992). An error may be harmless where the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict. Sanchez, 595 A.2d at 621 (citing Commonwealth v. Duffey, 519 Pa. 348, 365-366, 548 A.2d 1178, 1186 (1988)).

This issue was raised on direct appeal and decided as follows by the Superior Court.

> In the present case, the trial court concluded that evidence of the September 17, 1994 shooting was relevant to establish identity. As noted, an expert witness in ballistic evidence concluded that the same gun that was used in the Ross shooting was used in the Hawkins murder. Appellant denied being the shooter and contended that the eyewitnesses were unreliable and biased. This ballistic evidence established that Appellant's gun was used on September 20, 1994, and provided significant evidence refuting his position. Furthermore, the trial court in this case concluded specifically that the probative value of the evidence outweighed its prejudicial impact, Trial Court Opinion, 10/26/99, at 14, and also instructed the jury as follows regarding the evidence:

You've heard evidence tending to prove that the defendant committed an offense for which he is not on trial. I'm speaking of the testimony to the effect that the defendant shot Eric Ross on September 17, 1994. This evidence is before you for a limited purpose; that is for the purpose of tending to show the identity of the defendant and his possession of a firearm near the time of the homicide for which he was on trial. This evidence must not be considered by you in any way other than for the purpose that I've just stated. You must not regard this evidence as showing that the defendant is a person of bad character or guilt. If you find the defendant guilty is must be because you're convinced by the evidence that he committed the crime charged and not because you believe he is wicked or had committed other offenses.

N.T., 9/22-24/98, at 463-64. This contention is meritless.

(Commonwealth Ex. 19 at 12-13, ECF No. 20-6) (citations omitted).

Here, the state court's decision is not clearly contrary to federal law as determined by the Supreme Court of the United States. Nor is it an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. In order for Petitioner to succeed on his claims it is not enough to convince a federal court that in its independent judgment the state court applied the law incorrectly, it must have applied the law in an "objectively unreasonable manner." Bell v. Cone, 535 U.S. at 698-699. Petitioner has not made such a showing and, therefore, is not entitled to habeas relief with respect to this claim.

4.     The petitioner's right to due process under the United States Constitution was violated when the trial court erred in not granting a new trial for jury misconduct and the PA. Superior Court and PA. Supreme Court erred in holding that a claim of juror misconduct is not cognizable under the PCRA.

In this regard, Petitioner asserts that the foreman of his jury, Reginald White, was a former classmate upon whom he had picked on during high school, and whom he would have challenged

for cause on the basis of potential bias had he recognized him. He further claims that one of the detectives on the case, Richard McDonald, would have been aware of Petitioner's connection to Mr. White, but did not reveal it.

Under the Sixth and Fourteenth Amendments, a defendant may not be deprived of any liberty without due process of law and in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. See <u>Irvin v. Dowd</u>, 366 U.S. 717, 722 (1961) ( "[T]he right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." ). The bias of a juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as a matter of law. <u>United States v. Wood</u>, 299 U.S. 123, 133 (1936).

The principal way in which this right to trial by "indifferent" jurors is secured is through the system of challenges exercised during *voir dire*. A court must excuse a prospective juror if actual bias is discovered during *voir dire*. *Accord* <u>Morgan v. Illinois</u>, 504 U.S. 719, 729-730 (1992) ("Voir dire plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.") (internal quotations and citations omitted). Bias can be revealed by a juror's express admission of that fact, but, more frequently, the reality of biased attitudes must be revealed by circumstantial evidence. The Constitution does not require a new trial every time a juror has been placed in a potentially compromising situation, however, because it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. <u>Smith v. Phillips</u>, 455 U.S. 209, 217 (1982). Thus, the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias. *Id*. at 215 (collecting cases).

Here, Petitioner was available throughout *voir dire* and never raised this issue either with his counsel or with the trial judge. Instead, he sat through a three day trial with further opportunities to observe the juror and said nothing. When he raised this claim on direct review, the Trial Court held as follows.

> Finally, the defendant claims that a juror knew him and failed to reveal this during this *voir dire*. Again, the defendant has failed to plead this issue with enough specificity to allow this court to properly address this issue. Even assuming *arguendo* that his claim is true, the defendant does not allege that the juror was biased against him, or how this would have affected his decision in this case. Further, this court finds it inconceivable that the defendant would not have raised this issue during jury *voir dire*, when the jury was empaneled, or some time during or immediately after trial. This claim should also fail.

(Commonwealth Ex. 12 at 17, ECF No. 20-3).[2]

Here, the state courts found that Petitioner had failed to show any actual bias on the part of the juror named Reginald White. Petitioner has not shown that this determination is unreasonable in light of the facts presented. Nor has he demonstrated that bias should be presumed on this record. Consequently, Petitioner is not entitled to habeas corpus relief as to this claim.

   5.   The petitioner's right to due process under the United States Constitution was violated by juror misconduct, police misconduct/prosecutorial misconduct, and recantation evidence, and the newly discovered evidence of "exculpatory" eyewitness Jermale Walker.

      A.   Juror Misconduct

      B.   Police Misconduct—Prosecution Misconduct

---

2. Petitioner also raised this claim in his first PCRA where the Superior Court of Pennsylvania found that Petitioner had failed to provide analysis as to how this claim was cognizable under the seven enumerated circumstances set forth in the the Pennsylvania Post Conviction Relief Act, 42 Pa. Cons. Stat. §9543. (Commonwealth Ex. 34 at 4, ECF No. 21-7).

      C.      The newly discovered evidence of "exculpatory" eyewitness testimony of Jermale Walker.

      D.      Recantation Evidence

Petitioner's claim regarding juror misconduct is discussed above and found to be without merit.  In Claims B and D above, Petitioner claims the Commonwealth committed misconduct in obtaining the testimony of Tina Banks and that Ms. Banks has recanted her testimony.  To this end, Petitioner submitted an affidavit by Ms. Banks that provides as follows.

> I Tina Banks swear that I gave an false statement under oath that I had any knowledge on the Williams Daniels shooting/homicide of Ronald Hawkins, on Alpine Ave. on Sep. 20, 1994.
>
> I was forced to lie by Detective Canofari on the incident that occurred.  I was told that I would be put in jail for 18 years in a womens [sic] prison, and my children would be taken off of me if I didn't agree with what Detective Canofari told me to say when the trial came.  I was also offered money which I never excepted.
>
> I was showed pictures of the crime scene, also was told exactly what to state on the witness stand in order to keep my freedom and my children.
>
> If I wasn't told I would lose my life I wouldn't have ever agreed to any of this false testimony on an incident I had no information on what actually happened.  It gives me much pain to be involved in putting an innocent person in jail.  He lost years of his life, and I lost my respect and pride.

(Petitioner's Exhibit A, ECF No. 16-3).

Petitioner asserts that he is entitled to federal habeas corpus relief because he was convicted on the basis of perjured testimony.  Specifically, Petitioner contends that he is entitled to habeas corpus relief on the basis that his due process rights have been violated by the state's failure to cure a conviction that was secured through perjured testimony.  *See, e.g.*, Sanders v. Sullivan, 863 F.2d 218, 222 (2d Cir.1988) (holding that a due process violation would occur "when a credible

recantation of the testimony in question would most likely change the outcome of the trial and a state leaves the conviction in place."). *Accord* Mastrian v. McManus, 554 F.2d 813, 822-23 (8th Cir.), *cert. denied*, 433 U.S. 913 (1977).

For purposes of this Court's review, there exists a strong presumption against recantation testimony.

> Recantation testimony is properly viewed with great suspicion. It upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction. For these reasons, a witness' recantation of trial testimony typically will justify a new trial only where the reviewing judge after analyzing the recantation is satisfied that it is true and that it will render probable a different verdict.

Dobbert v. Wainwright, 468 U.S. 1231, 1234 (1984) (dissenting opinion); Spence v. Johnson, 80 F.3d 989, 1003 (5th Cir.1996) ("[r]ecanting affidavits and witnesses are viewed with extreme suspicion by the courts."). *See also* Commonwealth v. Henry, 550 Pa. 346, 706 A.2d 313, 321 (1997) ("Recantation testimony is extremely unreliable. When the recantation involves an admission of perjury, it is the least reliable form of proof.") (internal citations omitted).

Unfortunately for Petitioner, Judge Bigley specifically found that Banks' recantation testimony was not credible. In his June 3, 2004 Notice of Intention Dismiss, Judge Bigley held as follows:

> Daniels' final claim is that he is entitled to a new trial based on after-discovered evidence. Specifically, he relies upon the April 26, 2003 affidavit of Tina Banks who testified at trial that she knew Williams and saw him shoot the victim. In her affidavit, Banks recants her eyewitness testimony. This affidavit does not require an evidentiary hearing.
>
> In Commonwealth v. Williams, 732 A.2d 1167 (Pa. 1999), the Supreme Court addressed a claim for post-conviction relief based on

facts nearly identical to those of the instant matter.  <u>Williams</u> requires that when a "central" witness recants post-trial, the PCRA Court must make an independent credibility determination of the witness's prospective testimony.  There should be particularized findings by the court considering the witness' credibility, the trial record and affidavits in support of the post-conviction hearing.  This process is necessary if the court determines that an evidentiary hearing is not required.  An evidentiary hearing is not required to dispose of this claim for the following reasons.

This Court heard the testimony of Tina Banks at trial and found it clear, convincing and credible.  Illustrative of the manner in which she testified was her "quick" retorts to questions asked on cross-examination by an experienced defense attorney.  When asked about lighting at the crime scene, defense counsel referred to photos taken in daytime and pointed out the shooting occurred after dark.  The following exchange then occurred:

Q:      And down where you were looking way down where you X'd, where you X'd your initials, your telling the jury you could see faces, are you?

A:      Street lights were on.  It was not that dark.

Q:      Do you see any street lights in this picture?

A:      You can't see the street light because it's covered from the picture cut off.

N.T. 9/22-24/89 at 150-151.

The foregoing exchange not only reflects a knowledge of the crime scene, but also the conviction of the witness that she in fact was able to observe the events she testified about.

In spite of Bank's responses, defense counsel further pressed her regarding her ability to identify those she saw involved in the shooting.

Q:      I'm going to go and ask you again, you can't tell us you could see faces down there, could you?

A:      I didn't have to see faces, I knew what they had on.

> Q:     But in not being able to see a gun and in not being
>         able to see faces, you cant tell what happened down in
>         that melee, can you?  You really can't.
>
> A:     Yes I can.

Id. at 151.

Again, the responses of Banks reveal not only a conviction about her testimony, but also an ability to respond under pressure that one would not expect if the witness had been told what she should say.  Another example of Banks' ability as a witness is shown in an exchange on cross-examination after defense counsel asked about her eyesight.  She responded it was 50/20 at the time of the murder.  Counsel then asked the following questions going to her ability to observe based on photographs.  He then asked the following questions.

> Q:     Can you tell me if this person is even Caucasian or
>         African-American?
>
> A:     He's African-American.
>
> Q:     Can you see what's in his hands?
>
> A:     No.
>
> Q:     You can't see that's in his hands?  But with 50/20
>         vision at night you've got no problem seeing what you
>         just testified to?
>
> A:     Correct.
>
> Q:     That evening, did you have your glasses on?
>
> A:     I had contacts on.

Id. at 163-164.

Considering the portions of Ms. Banks' testimony herein quoted, and her testimony as whole, its content, her demeanor as a witness which is evident in the printed record and recalled by this court, there is simply no reason to credit the claims made in her affidavit that she was told what to say.

Tina Banks' credibility insofar as her recantation is further weakened by the other affidavits relied on by Daniels. As previously discussed, Jermale Walker's affidavits and those of Tolania Williams and petitioner's brother are so lacking in substance that they do not warrant the grant of an evidentiary hearing.

The trial record otherwise supports the veracity of Banks' testimony at trial. Prior claims made about Banks' ability to observe events and the bias of a witness charged with murder who testified for the Commonwealth were resolved against Daniels on direct appeal. The Superior Court noted the jury was informed of a purported bias and poor viewing conditions and nevertheless chose to believe the respective witnesses. Ballistics evidence was introduced proving Daniels' gun was used in the subject matter. The trial record supports the credibility of Tina Banks' trial testimony.

(Commonwealth Ex. 27 at 6, ECF No. 21-4).

The Superior Court affirmed this finding on appeal.

The trial court heard the testimony of Tina Banks at Daniels's trial and found it clear, convincing, and credible. Further, the trial court in considering Banks's testimony at trial as a whole, its content, and her demeanor as a witness, found no reason to credit the claims made in her affidavit that she was told what to say. In reviewing Daniels's claim, the trial court cites Commonwealth v. Williams, 732 A.2d 1167 (Pa. 1999), in which the Supreme Court addressed a claim for post-conviction relief based on facts nearly identical to those in this matter. The Court concluded that when a central witness recants post-trial, the PCRA court must make an independent credibility determination of the witness's prospective testimony. The Court should make particularized findings, considering the witness's credibility, the trial record and affidavits in support of the post-conviction hearing. As we set forth above, the trial court made particularized findings, considered Banks's trial testimony as a whole and found no reason to credit the claims made in her affidavit. We therefore affirm the trial court's conclusion that an evidentiary hearing on this issue was not necessary and was properly denied.

(Commonwealth Ex. 34 at 6-7, ECF No. 21-7) (some internal citations omitted).

When deciding this claim under AEDPA, the federal courts must apply the presumption of

correctness regarding factual and legal conclusions reached by the state courts as contained in 28

U.S.C.A. §2254 (d) and (e).  The state court's decision was not clearly contrary to federal law as determined by the Supreme Court of the United States.  Furthermore, the state court's determination was not an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. Consequently, Petitioner is not entitled to relief on this claims.  *Cf.* Landano v. Rafferty, 856 F.2d 569, 572 (3d Cir.1988). (finding that the witness' recantation testimony did not affirmatively exonerate petitioner but merely called into question the validity of the witness' identification of petitioner.)

In Claim 5(C), Petitioner claims that he is entitled to a new trial based upon the after discovered evidence of Jermale Walker.  In support of this assertion, he has submitted two affidavits by Walker, both dated October 10, 2000, which provide as follows:

> My name is Jermale Walker, my date of birth is October 3, 1974 and my present address is at the State Correctional Institution at Graterford, P.O. Box 244, Graterford, PA 19426.  However, on the date of the incident described below my address was 1618 Montier Street Apt. 9, Pittsburgh, PA 15221.  I, Female Walker depose and states the statements made below are true and correct and that I understand that false statements herein are made subject to the penalties of 18 Pa. C. S.A. 4904 and states the following:
>
> On September 20, 1994, I was picked up by a Jitney in the Manchester section of Pittsburgh Pennsylvania.  The driver of the Jitney was Ronald Hawkins and I directed him to take me to Alpine Street on the North Side of Pittsburgh.
>
> As I arrived on Alpine Street and while I was in the process of paying him, I noticed a car pull up next to the Jitney.  The car looked suspicious so I jumped in the back of the Jitney and exited through the opposite side of the back door. As I exited I heard shots being fired.
>
> I ducked and ran as fast as I could and did get away from the scene. I later found that the Jitney driver had been killed by the shooting.  I also later found that Mr. William Daniels was the individual charged with the shooting.  I know Mr. Daniels personally

and know that he was not the individual that shot the Jitney driver on the day in question.

(Petitioner's Ex. E, ECF No. 16-7).

I, Jermale Walker, the undersigned defiant [sic] do hereby declare and depose as follows:

1.      My name is Jermale Walker, my date of birth is October 3, 1974.

2.      I am currently incarcerated at the State Correctional Institution at Graterford, Pennsylvania.

3.      In September of 1994 I was living permanently with my mother in the Beltzhoover section of the city but staying temporarily on the North Side of the city of Pittsburgh.

4.      On September 30 [changed to 20 in handwriting], 1994, I had taken a jitney from the Manchester section of the North Side of Pittsburgh to visit a woman on Alpine Street in the Mexican War Streets on the North Side of the city of Pittsburgh.

5.      As the jitney neared its destination I was preparing to pay the driver when a dark automobile pulled up on the right hand side of the jitney.

6.      There were three or four occupants of the dark car and they were shouting and yelling but I was unaware of what they were saying or to whom it was directed.

7.      Shortly after the shouting at least two of the occupants pulled guns and began shooting in the direction of the jitney.

8.      At this point I jumped into the backseat, opened the driver's side rear door and fled.

9.      To this day I do not know who was in the car and did the shooting. [handwritten *It wasn't William Daniel*]

10.     I did not make this evidence known to the police because at the time of the shooting I was wanted by the police for an unrelated crime and knew that if I talked to the police I would be arrested.

<u>VERIFICATION</u>

I verify that the Statements made in this AFFIDAVIT are true and correct. I under stand that false statements herein are made subject to the penalties of 18 Pa.C.S. Section 4904 relating to unsworn falsification to authorities.

(Petitioner's Ex. F, ECF No. 16-8). Petitioner argues that these statements indicate that Hawkins was killed by unknown drive-by shooters and not by him.

Judge Bigley reviewed this claim in Petitioner's first PCRA proceeding and held as follows.

Daniels next argues that he has identified Jermale Walker as a witness to the shooting of the jitney driver he was convicted of murdering. In an affidavit dated October 10, 2000, Walker, who was incarcerated at S.C.I. Graterford, wrote as follows.

On the date of the murder he was a passenger in the victim's jitney. When he arrived on Alpine Street a car pulled up next to the Jitney, it looked suspicious so he "jumped in the back of the Jitney and exited through the opposite side of the back door." As he exited he heard shots being fired. He then "ran as fast' as he could to get away from the scene. I later found that the Jitney driver had been killed by the shooting. Walker states he knows Daniels personally and that he did not shoot the victim.

Walker's description of his hasty exit from the jitney simply does not establish that he could have seen anyone who shot and killed the victim. As he exited the jitney he claims shots were being fired and he ran as fast as he could to get away.

Walker does not indicate if the shooters fired from inside or outside of the vehicle that approached the jitney. Last, although he claims to have personally known Daniels, he does not provide any detail on the relationship that suggests he knew him well enough as of September 1994 to have been able to positively say he did not shoot the victim. Walker's affidavit lacks sufficient detail to convince this Court that he indeed witnessed the shooting of the victim as he claimed. This position is further supported by another affidavit dated October 10, 2000 contained in the original court papers at CC 199516251.

. To this day Walker affidavit which is typed, he states the shooting." At the end of this paragraph is the handwritten phrase, "It wasn't William Daniels." This

handwriting is not initialed and the affidavit does not otherwise reflect that Walker knew William Daniels. The October 10, 2000 affidavits do not present sufficient, credible facts to justify an evidentiary hearing.

(Commonwealth Ex.27 at 2-3, ECF No.21-4).

The Superior Court affirmed this holding.

> In Daniels's third assertion of newly discovered evidence, he alleges that new eyewitness testimony from Jermale Walker, who was allegedly a passenger in the automobile at the time of the incident, is highly exculpatory. Daniels asserts that Walker's statements cast further doubt on the reliability of Banks's trial testimony. Walker, a previously unavailable eyewitness indicated that he was at the crime scene, that he knows Daniels, and that Daniels was not the shooter. Walker's affidavit, however, does not provide a sufficient offer of proof to convince us that he indeed saw the victim as he claimed, and therefore does not present sufficient credible facts to justify an evidentiary hearing. Rather, Walker avers only that he was at the scene, heard shots, and took flight, but does not assert that he saw anything. The trial court properly acted within its discretion in denying an evidentiary hearing based on this alleged new eyewitness testimony.

Commonwealth Ex. 34 at 8, ECF No. 21-7).

Petitioner has failed to show that the state court's decision is contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. Consequently, he is not entitled to relief on this claim.

In Claim 5 (D), Petitioner claims that he is entitled to relief based upon the recantation of Eric Ross who testified at Petitioner's trial that Petitioner had shot him three days prior to the murder of Ronald Hawkins. To this end, Petitioner submitted an affidavit dated January 20, 2005 by Eric Ross that provides as follows.

1.    My name is Eric Ross, my date of birth is 1-18-73.

2.    From April 98 to Oct. 98 Detective Canofari and Det. McDonald came to visit me at SCI Huntingdon many of times and said, "it would benefit me if I said William Daniels shot me on Sept. 17, 94 on Perrysville Ave."

3.      Det. Canofari and Det. McDonald also said I would be released at my next parole hearing for helping them out and when I went up for parole I was released.

4.      Then a week before the trial Det. Canofari told me exactly what to say and reminded me if they win, I also win.

5.      But the information I gave to Det. Canofari and Det. McDonald was not true and was a false statement and the testimony I gave at William Daniels trial Oct. 94 was false and untrue also.

7.      I am positively sure that William Daniels didn't shoot me on Sept. 17, 94 on Perrysville Ave. because it was very dark outside and I had my back to the street and when I heard the shots being fired I fell to the ground until the shooting stopped. I never look behind myself or in the direction of the car shooting and I was laying on the ground in front of another car.

8.      I Eric Ross do hereby swear that all the information contained herein is true and correct to the best of my knowledge, understanding, and belief. I know it's a possibility that I may get into trouble, but my conscience is weighing on me and bothering me for what I Eric Ross did to William Daniels.

(Petitioner's Ex. B, ECF No. 16-4).

This issue was raised in Petitioner's second PCRA following remand by the Supreme Court

of Pennsylvania. On October 17, 2008, Judge Bigley held as follows.

> On July 15, 2008, a hearing was conducted. Eric Ross did not appear to testify on behalf of the petitioner. At the petitioner's request, the court issued a warrant for Eric Ross who was brought to court in the afternoon by the Allegheny County Sheriff's Department. Upon taking the witness stand Eric Ross, after conferring with counsel, asserted his Fifth Amendment privilege and refused to testify. Thereafter, the court dismissed the second PCRA Petition. The petitioner has appealed this determination. Because the petitioner was unable to present evidence at the hearing regarding the alleged recanted testimony of Eric Ross, the court was without sufficient evidence to make findings warranting the requested relief. The remaining allegations in the Amended Second Post-Conviction Relief Act Petition, which evidence was submitted during the trial, would not have compelled a different verdict as the Commonwealth presented adequate evidence of defendant's guilt beyond a reasonable doubt.

(Commonwealth Ex. 49, ECF No. 22-5) (internal citations omitted).

On May 5, 2009, the Superior Court of Pennsylvania affirmed this determination.

> Because Eric Ross refused to testify, Appellant did not meet his burden of establishing that the newly-discovered evidence was not cumulative, was not being used solely to impeach credibility, and would likely compel different verdict. Because Appellant did not meet his burden in this regard, we find no error by the PCRA court in dismissing this claim. We agree with Appellant that the invocation of the Fifth Amendment privilege renders Eric Ross "unavailable." However, Appellant fails to cite to any case law dictating that an order must be denied without privilege for the opportunity to present the unavailable witness at a later time if he or she shall become available. We decline the invitation to modify the PCRA court's order to allow Appellant to avail himself of this opportunity. Accordingly, Appellant's first argument fails.

(Commonwealth Ex. 53 at 5, ECF No. 22-7).

Petitioner was given the opportunity to present Eric Ross' recantation testimony during the PCRA hearing. Unfortunately for Petitioner, Mr. Ross declined to testify on his behalf. In light of these circumstances, it cannot be said that the state court's decisions were clearly contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. Consequently, he is not entitled to relief as to this claim.

6.     Petitioner's right to due process under the United States Constitution was violated and petitioner is entitled to a new trial based upon the after-discovered materially exculpatory evidence of Rayco Saunders' identification of another person who was in possession of the murder weapon at the time of the commission of, and committed, the homicide in the instant matter.

Petitioner claims that Mr. Saunders establishes that Petitioner did not shoot Mr. Hawkins because the firearm was in the possession of another person, an individual named Durrell King. At the evidentiary hearing, Mr. Saunders testified that in 1995, police entered his home and charged him with the criminal possession of a .40-caliber firearm. He stated that the firearm had been purchased

by him in mid-August 1995 and that he had been in possession of the gun for approximately one week when the police arrested him. He further claimed that he saw Durrell King in possession of the firearm nine months before and less than four months after the fatal shooting in the case. Petitioner asserts that because Mr. Saunders' testimony established that a person other than himself had been in possession of the firearm, such testimony created a reasonable doubt as to whether Petitioner was the individual who actually shot and killed Mr. Hawkins.

In its review of this claim, the Superior Court of Pennsylvania held as follows:

> Appellant alleges that Rayco Saunders saw another individual, Durrell King, in possession of the firearm used in the commission of the homicide both nine months before and less than four months after the September 20, 1994 murder. Appellant reasons that the jury would be able to infer that Mr. King had continuous possession of the firearm from approximately December 1993 until January 1995, and therefore, Appellant could not have used the firearm to kill the victim.

> However, Mr. Saunders testified that he was not sure that the firearm in Mr. King's possession nine months before the shooting was the same firearm that he purchased from him in 1995. Additionally, Mr. Saunders stated that on September 20, 1994, the day of the shooting, he did not know where the firearm was located because he was incarcerated from July 21, 1995 until December 21, 1994.

> Moreover, Brian Weismantle, a homicide detective, testified that it is typical for a firearm to travel through various hands meaning that one firearm could be used by multiple defendants for multiple criminal incidents. Specifically, the firearm in this case matched ballistics in at least two other open criminal cases. Finally, Thomas J. Flamini, Jr., an investigator with the State Security Investigation Services, testified that he interviewed Mr. Saunders about the identity of the person in possession of this particular firearm at the time of the homicide, and Mr. Saunders indicated that he did not know the identity of the person because he was incarcerated at the time.

> Based upon the above testimony, we find the record supports the PCRA court's conclusion that the testimony of Mr. Saunders would not likely have compelled a different result in this instance. Therefore, Appellant's second argument fails.

(Commonwealth Ex. 53 at 6-8, ECF No. 22-7).

To obtain a new trial based on after-discovered evidence, a defendant must show that the evidence: (1) was discovered after the trial and could not have been obtained at or prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) is of such a nature and character that a different verdict will likely result if a new trial is granted. Commonwealth v. Wilson, 537 Pa. 485, 511, 649 A.2d 435, 448 (1994), *cert. denied*, 516 U.S. 850 (1995). *Accord* Commonwealth v. Randolph, 582 Pa. 576, 873 A.2d 1277, 1283 (2005). In making this determination, a court should consider the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, and the overall strength of the evidence supporting the conviction. Commonwealth v. Padillas, 997 A.2d 356, 365 (Pa. Super. 2010).

The Superior Court held that it was not likely that Saunders' testimony would have compelled a different result if it had been offered at trial and that, therefore, the standard under Pennsylvania law for granting a new trial based on after-discovered evidence was not met. This court must consider whether the state court's denial of Petitioner's motion for a new trial presented an error of constitutional magnitude. Where a request for a new trial is based on allegedly newly-discovered evidence, the evidence must bear upon the constitutionality of the petitioner's detention' in order for federal habeas relief to be warranted. *See* Townsend v. Sain, 372 U.S. 293, 317 (1963), *rev'd on other grounds*, 504 U.S. 1 (1992). Unless the newly discovered evidence would probably produce an acquittal on retrial, the mere existence of newly discovered evidence relevant to the guilt of a state prisoner generally is not a ground for relief on federal habeas corpus. DeMartino v. Weidenburner, 616 F.2d 708, 711 (3d Cir. 1980); Mastrian v. McManus, 554 F.2d 813, 823 (8th Cir. 1977). Here, upon review of the record, this court cannot conclude that Saunders'

testimony would probably produce an acquittal on retrial. As such, Petitioner fails to state a claim cognizable under section 2254. *Accord* <u>Driver v. Beard</u>, Civil No. 09-4444, 2010 WL 3655897 (Aug. 11, 2010).

      7.     Petitioners' 6th Amendment rights under the United States Constitution were violated by ineffective assistance of counsel.

            A.     Trial counsel was ineffective for failing to file a written motion or perfect his argument with regard to the suppression of the petitioner's "statement." The legal basis for the petitioner's suppression motion is "not clear" for the record. The petitioner asserts that he "never" gave the statement or signed the rights form.

            B.     Trial counsel was ineffective for failing to interview, investigate and present two fact witnesses: Norman Daniels and Robert Bledsoe; and for failing to investigate and interview and present two alibi defense witnesses: Norman Daniels and Tolania Williams. All four witnesses were known to trial counsel and were willing to testify at trial.

Petitioner's seventh claim alleges violations of his Sixth Amendment right to effective assistance of counsel. The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance: 1) counsel's performance was unreasonable; and 2) counsel's unreasonable performance actually prejudiced the defense. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)). To determine whether counsel performed below the level expected from a reasonably competent attorney, it is necessary to judge counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct. <u>Strickland</u>, 466 U.S. at 690. A petitioner who claims that he or she was denied effective assistance of counsel carries the burden of proof. <u>United States v. Cronic</u>, 466 U.S. 648, 658 (1984).

The first prong of the Strickland test requires a defendant to establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 688. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy." *Id.* at 689. The question is not whether the defense was free from errors of judgement, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place. *Id.*

The second prong requires a defendant to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair or unreliable. Strickland, 466 U.S. at 689. To prove prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 694 (emphasis added). A "reasonable probability" is one that is sufficient to undermine confidence in the outcome. *Id.*

In Kimmelman v. Morrison, 477 U.S. 365 (1986), the Court determined that a habeas petitioner could raise a claim of ineffective assistance when his trial counsel failed to file a timely pre-trial motion to suppress evidence allegedly obtained in violation of the Fourth Amendment. Notwithstanding, the Court instructed that the mere failure to file a timely suppression motion does not constitute per se ineffective representation. Kimmelman, 477 U.S. at 383. To demonstrate actual prejudice under the second prong of the Strickland test, a petitioner must prove that the Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence. Kimmelman, 477 U.S. at 375.

In his first ineffectiveness claim, Petitioner claims that trial counsel was ineffective for failing to file a Motion to Suppress his statement to the police arguing that he did not make a statement. Specifically, Petitioner claims that the testimony by Detective Richard McDonald, a detective with the City of Pittsburgh Homicide Division, should have been suppressed. The record shows that on September 22, 1998, Judge Bigley heard and denied Petitioner's Motion to Suppress this testimony. Petitioner raised this claim on direct appeal where Judge Bigley held as follows.

> The defendant's first allegation of ineffective assistance concerns defense counsel's failure to file a written Motion to Suppress Statements. This motion was made orally, on the record, before any testimony in this case. A discussion with both counsel before trial, but apparently before the court reporter began making a record, revealed that the defendant told defense counsel on the day of trial that he did not make any statements. For that reason, defense counsel presented an oral Motion to Suppress. The defendant now argues that trial counsel was ineffective for failing to file a written motion. However, the defendant cannot show how he was prejudiced by the failure to file a written motion as opposed to presenting the issues orally on the record. Further, in light of the overwhelming evidence of the defendant's guilt, he cannot establish that the filing of a written motion to suppress his statement would have changed the result in this case. As a result, this claim must fail.

(Commonwealth Ex. 12 at 15-16, ECF No. 20-3).

The Superior Court affirmed this determination as follows.

> Appellant also posits that his counsel was ineffective for eliciting testimony from a police detective about Appellant's exercise of his right to remain silent. Specifically, as noted above, Appellant initially started to speak with police and after making some statements, told them that he wanted to stop. The immediately ceased questioning him. Appellant's counsel delved into this subject during the cross-examination of Detective McDonald to suggest that it was not credible that Appellant initially would make statements against his own interest and then decide to stop speaking with police. The only testimony concerning this issue was that Appellant was given his constitutional warnings, spoke with police, and then said that he wanted to stop. This evidence had absolutely no impact on the trial,

and counsel had a reasonable basis for conducting this line of questioning. This contention is meritless.

(Commonwealth Ex. 19 at 15, ECF No. 20-6).

For the same reasons stated above, I find that counsel did not render ineffective assistance for failing to file a written motion to suppress Petitioner's statements. First, in light of the discussion above, it does not appear that the trial court would have granted a written motion had it been filed as it specifically declined to grant counsel's oral motion. *See* <u>United States v. Sanders</u>, 165 F.3d 248, 253-254 (3d Cir. 1999) ("There can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument."). Second, I can not find that there is a reasonable probability that the verdict would have been different absent the excludable evidence. Consequently, Petitioner is not entitled to habeas relief on this claim.

Petitioner's second ineffectiveness claim concerns counsel's failure to interview, investigate and present two fact witnesses - Norman Daniels and Robert Bledsoe and two alibi defense witnesses - Norman Daniels and Tolania Williams.

Specifically, with respect to the fact witnesses, Petitioner claims that Norman Daniels and Robert Bledsoe would have testified that they were not playing cards with Tina Banks, as she testified to at trial. On direct appeal, the Trial Court denied this claim as follows.

> The defendant also contends that counsel was ineffective for failing to question Tina Banks regarding alleged bias and failing to present two witnesses who would have contradicted her testimony at trial that she was playing cards on the night the victim was killed. The defendant first alleges that defense counsel failed to question Banks regarding bias in that the defendant allegedly physically assaulted Banks' brother on the same day that she gave her statement to the police. He also claims that two witnesses, Robert Bledsoe and Norman Daniels (the brother of the defendant), would have testified that they were not playing cards with her on the night of the shooting as she claimed.

As to the issue of the alleged bias of Tina Banks, the defendant does not allege that trial counsel was aware of this issue at the time of trial. The defendant also fails to indicate how he was prejudiced by counsel's failure to inquire about this alleged bias, or how it may have affected the result. In light of all [the] overwhelming evidence of the defendant's guilt, independent of Banks' testimony, the defendant cannot demonstrate that the result would have been different. The same is true for the defendant's claim that trial counsel failed to call two witnesses to rebut Banks' testimony that she was playing cards with them. Counsel did, in fact question Banks about Robert Bledsoe, claiming that he had been in the Allegheny County Jail on the night in question. [T.T. 157-158] The defendant cannot show that he was prejudiced, not can he show that the presentation of these two witnesses would have affected the outcome of the case.

(Commonwealth Ex. 12 at 16-17, ECF No. 20-3).

Petitioner has not demonstrated that this determination is contrary to, or an unreasonable application of, clearly established federal law. Thus, he is not entitled to habeas relief as to this claim.

In his second ineffectiveness claim, Petitioner claims that Norman Daniels and Tolaina Williams would testify that Petitioner was with them inside playing video games at the time of the shooting. In this regard, he attaches affidavits from these potential witnesses, which provide as follows.

I, Norman Daniels, the Brother of defendant and undersigned defiant [sic] do hereby declare and depose as follows:

1. My name is Norman Daniels, my date of birth is December 28, 1971.

2. On September 20, 1994, I was living in Pittsburgh, Pennsylvania, on 527 Alpine Street, 15212 (which is located on the Northside of Pittsburgh).

3. On the date in question, September 20, 1994, I Norman Daniels, was present with my brother William Daniels, at my home

at the above aforementioned address, where we were both playing computer games all evening into the morning.

4.     I know and will testify in a court of law, under oath, that on the date and time of the shooting in question that William Daniels and myself were inside my home playing computer games.  There was one other person at my home who I believe will also testify to this fact and her name is Ms. Tolaina Williams.

5.     I had given this information in the past but it appears that I was not specific and detailed enough.

I verify that the Statements made in this Affidavit are true and correct.  I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. Section 4904 relating to unsworn falsification to authorities.

(Petitioner's Ex. U, ECF No. 16-23).

I, Tolaina Williams, the undersigned defiant [sic] do hereby declare and depose as follows:

1.     My name is Tolaina Williams, my date of birth is January 27, 1975.

2.     On September 20, 1994, I was living on North Highland Avenue in Pittsburgh, Pennsylvania, at Centre Court apartments 15206.

3.     On September 20, 1994, William Daniels and Norman Daniels were playing comp;uter games all evening at his brothers, Norman Daniels house on Alpine Street in Pittsburgh, Pennsylvania 15212.

4.     I know that on that date of the shooting of the jitney driver (December 20, 1994) [sic], that William Daniels was not involved in said shooting because during the time of the shooting he was in Norman Daniels house playing on the computer in my presence.

5.     I remember the shooting and William Daniels was not involved and could not have been these because he was in Norman Daniels house playing games in front of me.

6.     I had given this information in the past but it appears that I was not specific enough.

I verify that the Statements made in this Affidavit are true and correct. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. Section 4904 relating to unsworn falsification to authorities.

(Petitioner's Ex. V, ECF No. 16-24).

On direct appeal, the Superior Court of Pennsylvania denied this claim as follows.

Appellant also seeks to raise after-discovered evidence and ineffectiveness claims regarding purported witnesses Jermale Walker, Tolania Williams, and Norman Daniels, who is, as noted above, Appellant's brother.

Appellant provides affidavits from those witnesses that indicate the following. Ms. Williams would have testified that she was with Appellant and Mr. Daniels at the time of the shooting. Mr. Daniels would have testified that he was with Appellant at the time of the shooting and that Appellant never left the scene of the shooting. In neither affidavit is Appellant placed at a location different from the shooting. Furthermore, neither affiant indicates that Appellant was not involved in the shooting. Mr. Daniels's affidavit does nothing more than impeach the testimony of Mr. Carr that Appellant left the shooting immediately after the shooting.

.  .  .

We are aware that Appellant attempted to amend his statement; however, even in this statement, he did not include any reference to the identity of Mr. Daniels or Ms. Williams, the witnesses who he now claims should have been presented. Appellant, who supposedly was with those witnesses at the time of the shooting, should have known these witnesses were and could have provided that information when the petition was filed. Even if not waived, the issue has no merit. The witnesses indicate only that they were with Appellant when the shooting occurred. They do not place him at a different location nor do they indicate that Appellant was not involved in the shooting. The affidavits are not exculpatory in nature and do not, on their face, require even the grant of a hearing.

(Commonwealth Ex. 19 at 16; 18-19, ECF No. 20-6).

Petitioner reiterated this claim in his PCRA proceeding where the Superior Court of Pennsylvania again held that witnesses' testimony was not exculpatory and did not required the grant of a hearing. (Commonwealth Ex. 34 at 9, ECF No. 21-7).

Petitioner has not demonstrated that the Superior Court's determinations are contrary to, or an unreasonable application of, clearly established federal law. Thus, he is not entitled to habeas relief as to this claim.

> 8. The petitioner's right to due process under the United States Constitution was violated when the trial court erred when it granted the Commonwealth's motion to prevent counsel for defense to cross-examine Commonwealth star witness Tina Banks about her involvement in narcotics and the bias Ms. Banks had against petitioner for assaulting her brother and the bias Ms. Banks had against Petitioner for assaulting her brother.

In this claim, Petitioner asserts a violation of his due process rights when the trial court granted the Commonwealth's Motion in Limine and did not allow Petitioner to cross-examine Tina Banks regarding her drug involvement.

A federal court must keep in mind the standard of review to be applied to allegations of trial error. In this regard, criminal defendants in this country are entitled to a fair, but not a perfect, trial. "[G]iven the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial," and the Constitution does not demand one. United States v. Hasting, 461 U.S. 499, 508 (1983) (internal citations omitted). This focus on fairness, rather than on perfection, protects society from individuals who have been duly and fairly convicted of crimes, thereby promoting "public respect for the criminal process." Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986).

A claim that one was denied "due process" is a claim that one was denied "fundamental fairness." See Riggins v. Nevada, 504 U.S. 127, 149 (1992) ("We have said that 'the Due Process

Clause guarantees the fundamental elements of fairness in a criminal trial'"); <u>Lisenba v. California</u>, 314 U.S. 219, 236 (1941) ("The aim of the requirement of due process is . . . to prevent fundamental unfairness"); <u>Collins v. Scully</u>, 755 F.2d 16, 18 (2d Cir. 1985) ("In order to prevail on a claim that an . . . error deprived the defendant of due process under the Fourteenth Amendment he must show that the error was so pervasive as to have denied him a fundamentally fair trial"). Because the guideposts for decision making under the rubric of due process are lacking, the Supreme Court has cautioned that:

> In the field of criminal law, we have defined the category of infractions that violate 'fundamental fairness' very narrowly based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation. The Bill of Rights speaks in explicit terms to many aspects of criminal procedure, and the expansion of those constitutional guarantees under the open-ended rubric of the Due Process Clause invites undue interference with both considered legislative judgments and the careful balance that the Constitution strikes between liberty and order. It has never been thought that decisions under the Due Process Clause establish this Court as a rule-making organ for the promulgation of state rules of criminal procedure.

<u>Medina v. California</u>, 505 U.S. 437, 443-444 (1992) (internal quotations and citations omitted).

> Judges are not free, in defining 'due process,' to impose on law enforcement officials their personal and private notions of fairness and to disregard the limits that bind judges in their judicial function. They are to determine only whether the action complained of violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency.

<u>United States v. Lovasco</u>, 431 U.S. 783, 790 (1977) (internal quotations and citations omitted).

A trial is fundamentally unfair if there is a reasonable probability that the verdict might have been different had the trial been properly conducted. <u>Foy v. Donnelly</u>, 959 F.2d 1307, 1317 (5th Cir. 1992) (internal quotation marks omitted). Where the evidence of guilt is so strong that there is no

reasonable probability that the verdict might have been different, errors, if any were committed, could not deny the defendant fundamental fairness. *See, e.g.*, United States v. Copple, 24 F.3d 535, 547 n. 17 (3d Cir.1994) ("To the extent any of the incidents constituted error, we believe that in light of the strong evidence of guilt, the errors were harmless and did not deprive Copple of a fundamentally fair trial.").

Petitioner raised this claim on direct review where Judge Bigley held as follows.

> The defendant next alleges that this court erred granting the Commonwealth's Motion in Limine and not allowing defense counsel to cross-examine Tina Banks regarding her alleged involvement in narcotics. Essentially, defense counsel wanted to ask this witness whther she had any convictions for drug offenses. This court properly found it to be absolutely irrelevant, as well as an offensive collateral matter, and therefore inadmissible. For the reasons, this court granted the Commonwealth's Motion in Limine. FN 8. For these reasons this claim must fail.

> FN 8. Trial counsel did, nevertheless, question Banks about narcotics involvement. [T.T. 158-159].

(Commonwealth Ex. 12 at 14-15, ECF No. 20-3).

Petitioner argues that he was denied a fair trial because the Commonwealth failed to prosecute Ms. Banks on drug charges in exchange for her favorable testimony in his case. Petitioner has the burden of setting forth sufficient facts to support each claim. Making a bald assertion that Ms. Banks was subject to prosecution is speculative at best. Bald assertions and conclusory allegations do not afford a sufficient ground to provide habeas relief. Zettlemoyer v. Fulcomer, 923 F.2d 284, 298 & n. 12 (3d Cir.), *cert. denied*, 502 U.S. 902 (1991); Mayberry v. Petsock, 821 F.2d 179, 185 (3d Cir.), *cert. denied*, 484 U.S. 946 (1987).

Petitioner does not submit any evidence in support of his assertion. Specifically, he has not

shown that Ms. Banks was the potential subject of prosecution and that charges were not filed in

light of her testimony. As such, he has not shown that he is entitled to relief as to this claim.

With respect to his claim regarding Ms. Banks' potential bias, Petitioner raised this claim on

direct appeal in terms of ineffective assistance of counsel.

> Appellant next maintains that his trial counsel was ineffective
> for failing to impeach the credibility of Ms. Banks with the fact that
> Appellant allegedly had shot at her brother prior to the evening of the
> shooting.
>
> .   .   .
>
> In the present case, the trial court noted that in light of the
> overwhelming evidence presented against Appellant, including the
> testimony of two eyewitnesses, the ballistics evidence, and
> Appellant's own statement, Appellant cannot establish that the
> outcome of the trial was affected by counsel's failure to impeach Ms.
> Banks with this testimony. We agree and reject this claim.

(Commonwealth Ex. 19 at 13-14, ECF No. 20-6).

I agree. *Accord* United States v. Hoffecker, 530 F.3d 137 (3d Cir. 2008). Consequently,

Petitioner is not entitled to habeas relief as to this claim.

> 9.  Claims based on "actual innocence" or misconduct of justice cannot
> be procedurally barred because the imprisonment on an innocent
> person violates the due process clause and the 8th Amendment
> prohibition against cruel and unusual punishment.

Petitioner misunderstands his constitutional rights.

> Claims of actual innocence based on newly discovered
> evidence have never been held to state a ground for federal habeas
> relief absent an independent constitutional violation occurring in the
> underlying state criminal proceeding. Chief Justice Warren made this
> clear in Townsend v. Sain, supra, 372 U.S., at 317 (emphasis added):
>
> > "Where newly discovered evidence is alleged in a
> > habeas application, evidence which could not

> reasonably have been presented to the state trier of facts, the federal court must grant an evidentiary hearing. Of course, such evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus."
>
> This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution-not to correct errors of fact. *See, e.g.*, Moore v. Dempsey, 261 U.S. 86, 87-88 (1923) (Holmes, J.) ("[W]hat we have to deal with [on habeas review] is not the petitioners' innocence or guilt but solely the question whether their constitutional rights have been preserved"); Hyde v. Shine, 199 U.S. 62, 84 (1905) ("[I]t is well settled that upon habeas corpus the court will not weigh the evidence") (emphasis in original); Ex parte Terry, 128 U.S. 289, 305 (1888) ("As the writ of habeas corpus does not perform the office of a writ of error or an appeal, [the facts establishing guilt] cannot be re-examined or reviewed in this collateral proceeding") (emphasis in original).
>
> More recent authority construing federal habeas statutes speaks in a similar vein. "Federal courts are not forums in which to relitigate state trials." Barefoot v. Estelle, 463 U.S. 880, 887 (1983). The guilt or innocence determination in state criminal trials is "a decisive and portentous event." Wainwright v. Sykes, 433 U.S. 72, 90 (1977). "Society's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens." *Ibid*. Few rulings would be more disruptive of our federal system than to provide for federal habeas review of freestanding claims of actual innocence.

Herrera v. Collins, 506 U.S. 390, 400-401 (1993) (plurality).

Notwithstanding, the Supreme Court has held that a showing of actual innocence can serve as a "gateway" to the review of otherwise procedurally defaulted constitutional claims. In Schlup v. Delo, 513 U.S. 298 (1995), the Supreme Court clarified that a federal habeas petitioner who is asserting actual innocence as a procedural gateway is obliged to demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." The Court stated

that a habeas petitioner claiming that new evidence demonstrates that he is actually innocent "must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id*. at 327. Furthermore, "[t]he habeas court must make its determination concerning the petitioner's innocence 'in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." *Id*. at 328. In other words, the district court must make "a probabilistic determination about what reasonable, properly instructed jurors would do." *Id*. at 329. The Supreme Court has emphasized that this standard "is demanding and permits review only in the extraordinary case." House v. Bell, 547 U.S. 518, 538 (2006) (internal quotation marks omitted); *see also* Sweger v. Chesney, 294 F.3d 506, 523-24 (3d Cir. 2002) (describing the burden a petitioner must meet to establish actual innocence as "extremely high").

Here, Petitioner has failed to support his claim of actual innocence with new reliable evidence establishing that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *See* Teagle v. Diguglielmo, 336 Fed. App'x 209 (3d Cir. 2009) (finding that, even assuming that three recantation affidavits constituted new and reliable evidence, they failed to establish that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt). Consequently, he is not entitled to habeas relief as to this claim.

### D. Certificate of Appealability

Section 2253 generally governs appeals from district court orders regarding habeas petitions. Section 2253(c)(1)(A) provides that an appeal may not be taken from a final order in a habeas proceeding in which the detention arises out of process issued by a State court unless a certificate

of appealability has been issued. A certificate of appealability should be issued only when a petitioner has made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2254(c)(2). Here, the record fails to show a violation of Petitioner's constitutional rights. Accordingly, a certificate of appealability should be denied.

### III. CONCLUSION

Based on the discussion above, it is respectfully recommended that the Petition for Writ of Habeas Corpus be denied and that a certificate of appealability be denied.

In accordance with the applicable provisions of the Magistrate Judges Act [28 U.S.C. § 636(b)(1)(B) & (C)] and Rule 72.D.2 of the Local Rules of Court, the parties shall have fourteen days from the date of the service of this report and recommendation to file written objections thereto. Any party opposing such objections shall have fourteen days from the date on which the objections are served to file its response. A party's failure to file timely objections may constitute a waiver of that party's appellate rights.

_____
Lisa Pupo Lenihan
United States Magistrate Judge

Dated: October 5, 2010

cc:    William M. Daniels, Jr.
       DU-7194
       SCI Dallas
       Follies Road
       Drawer K
       Dallas, PA 18612